WO                                                                                      SKC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Anthony Cecil Baker,

                Plaintiff,

v.

Jarrot J. Tevault, et al.,

                Defendants.

No.   CV 20-01960-PHX-JAT (JZB)

**ORDER**

Plaintiff Anthony Cecil Baker, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983.   Defendant Tevault moves for summary judgment.  (Doc. 50.)  The Motion is fully briefed.  (Doc. 55, 60.)

The Court will grant the Motion for Summary Judgment.

## I.   Background

This action arises from a November 8, 2019 traffic stop in which Defendant City of Surprise ("Surprise") Police Officer Jarrot T. Tevault allegedly used excessive force against Plaintiff during a traffic stop in violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure and retaliated against Plaintiff by increasing his use of force when Plaintiff questioned Tevault during the stop in violation of Plaintiff's First Amendment right to free speech.  (Doc. 1.)

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

. . . .

. . . .

**III.   Facts**[1]

On November 8, 2019, Defendant Surprise Police Officer Tevault and non-Defendant Surprise Police Sergeant Boxberger had just left a call near the 16800 block of West Bell Road in separate vehicles; Tevault was in full police uniform with equipment. (Doc. 51 (Def.'s Statement of Facts (DSOF)) ¶¶ 1−2.)  Tevault was travelling eastbound on Bell near State Route 303 in the number 2 lane, and he observed Plaintiff driving in the number 1 lane.  (*Id.* ¶ 3.)  According to Tevault, Plaintiff's vehicle was swerving within the lane and over the lane lines near 16500 West Bell, and based on Tevault's training and experience, such behaviors are consistent with impaired driving and pose a risk to the driver and the public on the road.  (*Id.* ¶ 3.)  Plaintiff disputes that he was weaving.  (Pl.'s Controverting Statement of Facts (PCSOF) ¶ 3.)  Traffic then stopped for a red light at the intersection of Bell and 165th Avenue, and Plaintiff's vehicle was the first vehicle stopped in the number 1 lane, and Tevault's vehicle was the second vehicle in the number 2 lane. (DSOF ¶ 4.)

While at the light, Officer Tevault activated his spotlight into the passenger compartment of Plaintiff's vehicle and observed that Plaintiff was holding a cellphone to his head.  (*Id.* ¶ 5; Doc. 51-2 (Tevault Dep.) at 25:22−26:4.)[2]  Plaintiff did not see any lights from Tevault, but he admits he answered a call on his cell phone, which he knew was unlawful while driving in Surprise.  (PCSOF ¶ 5.)  Upon seeing the cellphone, Tevault used his car's public address (PA) system to instruct Plaintiff to put the phone down, and

---

[1] Throughout his Statement of Facts, Defendant Tevault relies on the Surprise Police Department Officer Report of the relevant traffic stop to set forth facts about that incident. (*See* Doc. 51-1, Ex. A.)  Because this Report, attributed to Defendant, is unsigned and unsworn, Defendant may rely on it as evidence of what the report says but not for the truth of any matters asserted therein.  *See* Fed. R. Evid. 801(c).  Accordingly, where Defendant relies on this Report to show what occurred, the Court will not consider Defendant's facts unless they are also supported by other, admissible evidence in the record, such as by sworn declaration or deposition testimony or by direct video evidence.

[2] The parties did not provide the time of day these events occurred, but based on video evidence of the subsequent traffic stop, it was dark at the time.

he did not observe Plaintiff comply or acknowledge Tevault.  (DSOF ¶¶ 6−7.)  When Tevault did not see Plaintiff put his phone down, he decided to conduct a traffic stop, and just after the light turned green, he activated his emergency lights.  (*Id.* ¶ 8.)  At this time, Tevault claims Plaintiff turned on his right turn signal to indicate he was going to pull over on the right, and Plaintiff passed multiple driveways and intersections on the right where he could have pulled off, but Plaintiff did not pull over and then deactivated the signal.  (*Id.* ¶¶ 9, 11.)  After following Plaintiff for a quarter mile, Tevault "chirped" his siren and activated an even louder airhorn to get Plaintiff's attention.  (*Id.* ¶¶ 8, 10.)  Plaintiff pulled into the left turn lane at Bell and Sunrise Boulevard, one half mile past 165th Ave., and he stopped in the left turn lane several car lengths back from the intersection and did not proceed, even though the light was green.  (DSOF ¶¶ 12−13, 16.)

Plaintiff disputes the timing of these events or that he failed to put his phone down or ever turned on his right turn signal while Officer Tevault was behind him.  (PCSOF ¶¶ 6−11.)  He claims that Tevault did not use his PA to tell Plaintiff to put his phone down at the intersection of Bell and 165th Ave but only did so 100 yards before Plaintiff entered the left turn lane on Bell at Sunrise, and Plaintiff then put his phone down as instructed.  (*Id.* ¶¶ 6−7.)  According to Plaintiff, Tevault also did not activate his emergency lights until Plaintiff had already pulled into the left turn lane, and Tevault did not activate his siren or air horn until Plaintiff was already beginning to turn left onto Sunrise.  (*Id.* ¶¶ 6, 8, 10, 11.)  Plaintiff also disputes that he stopped in the turn lane and did not turn, even though the light was green, claiming he pulled into the turn lane and stopped at or near the crosswalk, then turned left as soon as the light was green.  (PCSOF ¶¶ 12−13.)

After Plaintiff pulled into the left turn lane at Bell and Sunrise, Officer Tevault parked behind Plaintiff and waited a few seconds to see if Plaintiff was going to move, then exited his patrol car and approached Plaintiff's vehicle on foot.  (DSOF ¶ 14.)  Tevault believed he had activated his Axon body camera but later discovered it was not on.  (*Id.* n.5.)  As Tevault approached Plaintiff's vehicle, Plaintiff pulled away and made the left turn onto Sunrise.  (*Id.* ¶ 15.)  Sgt. Boxberger, who was travelling behind Tevault, saw

Tevault stop his patrol car in the left turn lane that leads into Sun City Grand, and he could see that the vehicle Tevault was trying to pull over was a maroon SUV.  (Doc. 51-1, Ex. C. (Boxberger Decl.) at 15:2−25.)  According to Boxberger, the light turned green after Tevault got out of his car, and the SUV Tevault was trying to stop turned north into the Sun City Grand entrance, and Tevault "hustled back to his car, got in his car, and then proceeded with the traffic stop." (*Id.* at 16:1−6; DSOF ¶ 16.)

Seconds after making the left turn, Plaintiff pulled into the first available parking area off Sunrise and parked in a parking spot near a guard shack at the entrance to the Sun City Grand Community.  (PCSOF ¶¶ 16−17.)  According to Officer Tevault, when Tevault arrived at the parking lot, he approached Plaintiff's vehicle quickly, and Plaintiff did not roll down the window.  (DSOF ¶ 19.)  Tevault grabbed the door handle of Plaintiff's car and attempted to open the car door, but the door was locked.  (*Id.* ¶ 20.)  Tevault did not notice the presence of Plaintiff's grandson in the vehicle.  (*Id.* ¶ 21.)  Plaintiff eventually rolled down his window, and Tevault ordered him out of the car.  (*Id.* ¶ 22.)  Tevault grabbed Plaintiff's left wrist while Plaintiff was still in the car and began to escort Plaintiff, who was 67 years old, 5'10" and weighed 236 pounds, out of the vehicle.  (DSOF ¶ 23; Doc. 56 (Pl.'s Additional Statement of Facts (PASOF).)[3]  Tevault then reached for Plaintiff's other hand and began to handcuff Plaintiff.  (Tevault Dep. at 56:7−57:14.)

Plaintiff disputes that he did not roll down his car window right away or that the car door was locked, claiming that, as Tevault approached his vehicle, Plaintiff immediately began rolling down his window and unlocked his car door, and he opened the car door and began to exit as Tevault instructed him to do.  (PCSOF ¶¶ 19−20, 22.)  While Plaintiff was facing Tevault outside the car, Tevault kneed Plaintiff in his groin, which Plaintiff identified as his inner right thigh, just above the knee, and then spun Plaintiff around against the side of the car.  (PCSOF ¶ 24.)[4]

---

[3] Tevault is 5'10,' weighed 195 pounds, and was wearing about 15 pounds of tactical gear at the time of the incident.  (Doc. 51-2, Ex. B. (Tevault Dep.) at 10:1−16.)

[4] Plaintiff's support for these facts comes from various sections of Plaintiff's

Officer Tevault claims that, while outside Plaintiff's car, when he was trying to place Plaintiff in handcuffs, Plaintiff used "defensive resistance by tightening [] his arms and trying to pull away from [Tevault's] grasp and also trie[d] to turn toward" Tevault. (DSOF ¶ 25; Tevault Dep. at 58:25−59:4.)  Plaintiff did not provide any testimony to the contrary as to this incident, but he generally claims that he never resisted Tevault at any time.  (PCSOF ¶ 25.)

Video from Sgt. Boxberger's Axon body worn camera (BWC) as Boxberger came onto the scene shows Plaintiff standing just outside the open driver's side door of his car with his body facing the car and his right side to the camera, and Tevault is standing directly behind him attempting to place Plaintiff's hands in handcuffs.  (PCSOF, Ex. 4 (BWC) at 01:42:33−45.)  During this time, Plaintiff can be heard on video loudly objecting, "What for?" and "I've got my Grandson in there," and while Plaintiff is yelling, Officer Tevault continues attempting to handcuff him and twice yells, "Stop!" (*Id.* at 01:42:33−34.)  The second time Tevault yells, "Stop," Plaintiff responds, "Nobody's doing anything.  Will you stop bending my arm?  What did I do?" (*Id.* at 01:42:34−42.)  Tevault responds, "You didn't stop for a police officer," while at the same time, he applies a handcuff to Plaintiff's right wrist and pivots toward the left with Plaintiff so that they are both now standing with their backs to the camera, facing the inside of the open car door.

As soon as Officer Tevault accuses Plaintiff of failing to stop for a police officer, Plaintiff responds, "I couldn't stop anywhere, did you want me to stop in the middle of the . . ." and, while he is yelling this, his left hand shoots out to his side, and he lifts it above his head.  (*Id.* at 01:42:45−48.)  According to Tevault, when Tevault "almost had the handcuffs on him and was getting ready to put the handcuff on, [Plaintiff] jerked his arm out of [Tevault's] grasp and had it raised about his head."  (DSOF ¶ 29; Tevault Dep. at

---

deposition testimony in which Plaintiff is asked to state what happened outside the car, and he gives a very compressed summary of the entire use-of-force encounter.  Plaintiff testified in relevant part that, "When I got out of the vehicle, he put his hands on me shoulders, brought his knee up into me groin, spun me around, and slapped me up the side of the car."  (Doc. 56, Ex. 1 (Pl. Dep.) at 22:25−23:2.)

65:5−8.)[5]  Tevault then immediately grabbed Plaintiff by the shoulders and wrapped his right arm around the back and right side of Plaintiff's head and spun Plaintiff's upper body completely around while throwing Plaintiff to the ground.  (DSOF ¶ 31; BWC at 01:42:48−49.)  Tevault testified that he "wrapped [his] arm over [Plaintiff's] shoulder," with his hand across Plaintiff's chest, and used Plaintiff's and his own combined body weight "in a circular motion to my left to throw him off balance and get him onto the ground."  (Tevault Dep. at 71:22−72:1.)[6]  While being grabbed and thrown to the ground,

---

[5] Plaintiff claims to dispute this sequence of events, stating that Officer Tevault first released Plaintiff's left hand to free his own hand to slam Plaintiff into the vehicle, and Plaintiff then put out his left hand to protect his face from hitting the car door.  (PCSOF ¶ 29.)  In support, Plaintiff relies solely on the BWC footage and the interpretation of counsel regarding what the video shows.  (*Id.*)  The opinions of counsel are not evidence.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 923 (9th Cir. 2001) ("arguments of counsel, however, are not evidence") (internal quotation marks and citation omitted); *Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1062 (S.D. Cal. 2007) ("this Court cannot consider factual evidence that [is] only proffered by counsel").  Additionally, the video clearly shows that Plaintiff pulled out and raised his left hand while he was arguing with Tevault, and it is not clear from the video that Tevault first let go of Plaintiff's left hand or pushed Plaintiff.  The mere fact that not every action is observable or clear from the video evidence is insufficient to create a genuine issue of material fact regarding Tevault's first-hand sworn testimony about what occurred.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Scott*, 550 U.S. at 380 (quoting *Anderson*, 477 Us. at 247−48) (internal quotation marks omitted) (emphases in *Anderson*); Fed. Rule Civ. P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").  Plaintiff's blanket statement that he did not do anything to resist Tevault at any time during the entire stop also fails to address the particulars of what he was doing at this time and is too conclusory to create a genuine issue of material fact that he did not pull his left arm away from Tevault's grasp during handcuffing.

[6] Plaintiff claims to dispute these facts, stating that Tevault "grabbed [him] around the neck," lifted him off the ground, and threw him to the pavement.  (PCSOF ¶ 31.) Tevault admits to spinning Plaintiff around and using his and Plaintiff's combined body weight to knock Plaintiff off balance and throw him to the ground.  The only material

Plaintiff yelled something like, "What the hell?" and then "What are you doing?" as he hit the ground. (BWC at 01:42:48−50.) Plaintiff landed on his right side and rolled onto his back and then rolled back and forth on the ground with his legs flailing while Tevault bent over him and maintained a hold on Plaintiff's upper body. (*Id.* at 01:42:50−53.)

Once on the ground, Plaintiff continued to roll over, turned to face Officer Tevault, and resisted Tevault's efforts to gain control of him, and Tevault was unable to place the handcuffs on Plaintiff. (DSOF ¶¶ 32, 33.)[7] Sgt. Boxberger approached while Plaintiff was lying on the ground on his left side loudly yelling objections, and Tevault was gripping Plaintiff's right shoulder, holding him down. (BWC at 01:43:12.) Boxberger told Plaintiff to "just relax," and once Boxberger perceived there was no threat, he assisted Plaintiff to

_____

dispute, then, is whether Tevault grabbed Plaintiff around the neck or around the right shoulder with his hand on Plaintiff's chest. Plaintiff once again relies solely on the BWC evidence and the opinion of counsel to support that Tevault grabbed Plaintiff around the neck. To the extent this fact is material, the actions take place too quickly to be clearly made out on the video. Absent any contrary first-hand account, the video evidence is therefore insufficient to create a genuine issue of material fact regarding Tevault's sworn testimony. In any case, the video shows that Tevault's sudden grab and take-down of Plaintiff are all part of one continuous movement that culminates in Tevault bringing Plaintiff to the ground, so to the extent Plaintiff suggests Tevault locked his arm around Plaintiff's neck or lifted Plaintiff off the ground as distinct uses of force rather than parts of a single, rapid takedown maneuver, this is unsupported by the evidence.

[7] Plaintiff disputes that he did these things, but he relies solely on the video evidence, which speaks for itself and does not materially controvert Tevault's deposition testimony, and on a single deposition statement that he never resisted Tevault at any time. (PSCOF ¶¶ 32, 33.) Plaintiff's blanket statement that he never resisted Tevault over the entire course of this encounter fails to account for what he was doing at any given time and is too conclusory to create a genuine issue of material fact that he did not resist Tevault's attempts to maintain control of him while on the ground. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"). Plaintiff also disputes that Officer Tevault was unable to affix handcuffs to him while on the ground, but the testimony he relies on from Tevault only relates to Sgt. Boxberger's decision to take Plaintiff into custody without handcuffs and does not controvert that Tevault had already tried unsuccessfully to handcuff Plaintiff.

his feet, asked Plaintiff if he had any weapons on him, to which Plaintiff replied, "No, I don't!," and Boxberger permitted Plaintiff to sit on the curb unhandcuffed.  (Boxberger Dep. at 32:24−33:5; BWC at 01:43:37−49.)  Tevault was unaware of Sgt. Boxberger's presence until after he took Plaintiff to the ground.  (DSOF ¶34.)

Officer Tevault cited Plaintiff for failing to stop for a police officer/vehicle and failure to stay in a single lane pursuant to Arizona Revised Statutes §§ 28-1595(A) and 28-729.1.  (DSOF ¶ 37.)  Plaintiff did not request medical attention on the scene, but he later went to the hospital and was diagnosed with a contusion/bruise, and the hospital provided recommendations for home care.  (*Id.* ¶ 39; Doc. 51-5at 3−4.)

A City of Surprise Police Department Investigation of this incident subsequently made findings against Officer Tevault regarding his use of force and failure to turn on his body camera.  (PASOF ¶ 56.)[8]

## IV.    Count One: Fourth Amendment Excessive-Use-of-Force

### A.    Legal Standards

#### 1    Fourth Amendment

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests."  *Id.*

---

[8] In PASOF ¶ 56, Plaintiff asserts, based solely on Officer Tevault's deposition statements, that Tevault was found to have violated Surprise Police Department Policy requiring officers to use only force that is objectively reasonable and necessary under the circumstances.  Plaintiff has not proffered any copies of Surprise Police Department policies or the investigative report from this incident showing the specific policy provisions Tevault allegedly violated or the nature of the findings against him.  The deposition evidence Plaintiff relies on shows that Tevault was found to have violated a requirement that officers must take steps to deescalate a situation if possible and a requirement that they turn on their body cameras and that Tevault disagreed with the first finding but admitted to the camera violation.  (Doc. 56 (Tevault Dep) at 62:20−64:13.)

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)).  This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).  But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on

credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

Where video evidence is available, the court "should [] view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S at 380−81. This does not mean, however, that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute. Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

### 2.  Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable

official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

**B.    Discussion**

Defendant argues he is entitled to summary judgment on Plaintiff's excessive-use-of-force claim based on qualified immunity because there was no Fourth Amendment violation, and Officer Tevault's use of force did not violate clearly established law. (Doc. 50 at 11, 13.)

**1.    Fourth Amendment Analysis**

Regarding the nature of the force used, Defendant argues that "taking Plaintiff to the ground and using a control technique to contain the situation was minimal." (*Id.* at 12.) Plaintiff disputes this and argues that the force used on Plaintiff, who was 67 years old at the time, by kneeing him in the groin, slamming him into the car door, placing him in a headlock, and then lifting him up and slamming him onto the pavement, was "far from trivial" and that district courts in this Circuit have found similar uses of force intermediate or severe. (Doc. 55 at 8.)

In *Carr v. County of San Diego*, the district court found that, taken together, the actions of five officers tasing a subject three times, pushing him to the ground with a hand at the base of his neck, holding him down with their collective weight, and kneeing him in the side of the face was not an "insubstantial intrusion" but was an "intermediate" use of force. No. 19-CV-1139 JLS (MDD), 2021 WL 4244596, at *14 (S.D. Cal. Sept. 17, 2021). In *Roberson v. City of Hawthorne*, the court assessed a use of force that involved "placing a subject in a headlock, throwing him against the wall and then to the ground, and then putting weight on his neck [and] his lower backside," and opined that, even though these actions took place quickly, "a violent tackle, especially focused on the head and neck area,

need not take long to be severe."  No. CV196913DMGJPRX, 2021 WL 852124 (C.D. Cal. Jan. 29, 2021).  On the other hand, the Ninth Circuit has described the use of a leg-sweep maneuver to trip a subject and take him to the ground in a controlled manner as a "modest deployment of force."  *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021).

Crediting Plaintiff's supported version of the facts and construing the facts and video evidence in Plaintiff's favor, the nature of the force Officer Tevault employed consisted of a single officer, the same height but of a slighter build than Plaintiff, pulling Plaintiff's hands together behind his back in an attempt to apply handcuffs, kneeing Plaintiff from behind in the inner thigh, and at the same time, pushing him toward an open car door and using a controlled take-down maneuver to spin him around by his upper body and throw him to the ground.  While not trivial, this use of force consisted mainly of a single, controlled takedown, which did not involve any of the additional uses of force— such as tasing, a knee blow to the face, and being pushed or held down at the neck— employed by the officers in *Carr* and *Roberson*, and therefore constitutes a modest use of force.  *See O'Doan*, 991 F.3d at 1037 ("The reverse reap throw maneuver that Officer Sanford used—a tripping technique that knocked O'Doan off balance and allowed Sanford to bring O'Doan to the ground—[] involved a modest deployment of force.")

Whether such force was reasonable in relation to the government interests at stake requires assessing such factors as the severity of the suspected crime, the threat posed by Plaintiff at the time, and whether Plaintiff was resisting arrest.  *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396−97.

Regarding the seriousness of the crime, Defendant acknowledges that Plaintiff was initially observed committing only minor traffic offenses, which Defendant argues including using a cellphone while driving, in violation of Surprise Ordinance § 54-8 (2018); failure to stay in a single lane, in violation of Arizona Revised Statutes § 28-729; and failure to stop for a police vehicle, in violation of Arizona Revised Statutes § 28-775(A)(2).  (Doc. 50 at 11.)  But Defendant argues Plaintiff was also suspected of driving while impaired, in violation of Arizona Revised Statutes § 28-1381—a more dangerous

offense that creates a hazard to public safety—and unlawful flight from a police officer, in violation of Arizona Revised Statutes § 28-622.01, a felony offense.  (Doc. 50 at 11.) Defendant further argues that Plaintiff posed a threat to Officer Tevault when he raised his left arm and twice attempted to turn towards Tevault while Tevault was trying to place handcuffs on him.  (*Id.*)  As to whether Plaintiff was resisting arrest, Defendant argues that a reasonable officer could have believed that Plaintiff had already engaged in conduct that suggested he would further attempt to resist or flee when he stopped his car in the left turn lane at Bell and Sunrise and then accelerated after Tevault had already exited his patrol vehicle and was approaching Plaintiff's car on foot.  (*Id.*)

Taking Plaintiff's supported version of the disputed facts as true, Plaintiff was not weaving while driving, and apart from using a cellphone, there was no cause to believe he was driving while impaired.  He also did not fail to pull over for a police officer because, based on Plaintiff's account, he had already pulled into the left turn lane at Bell and Sunrise before Officer Tevault activated his lights and siren, and he pulled his car all the way up to the light and waited for it to turn green, then completed his left turn and pulled into the first available parking area.  (PCSOF ¶¶ 6−11.)  Still, Plaintiff admits he was using his cellphone while driving, which he knew was a traffic violation, and it is undisputed that Tevault exited his car in the left turn lane behind Plaintiff and approached Plaintiff's vehicle, but Plaintiff did not roll down his window or acknowledge Tevault and instead pulled away, turning onto Sunrise, though Plaintiff claims he never saw Tevault approach his car.

Based on these facts, Plaintiff had violated a city traffic ordinance by using a cellphone while driving but was not weaving or driving impaired, and he did not fail to pull over for a police officer.  Additionally, a reasonable officer in Officer Tevault's position could have reasonably, albeit mistakenly, believed that Plaintiff had intentionally fled from a police officer when Plaintiff made a left turn onto Sunrise instead of remaining stopped in the turn lane while Tevault was approaching his car on foot, resulting in a more serious offense.  *See Blankenhorn*, 485 F.3d at 475 ("Ultimately, . . . our inquiry is not

whether Blankenhorn *was* trespassing.  Rather, it is whether a reasonable officer had probable cause to think he could have been.") (emphasis in original).

As to whether Plaintiff was resisting arrest, Officer Tevault testified that, after Tevault ordered/pulled Plaintiff out of his car and attempted to apply handcuffs on him, Plaintiff used "defensive resistance by tightening [] his arms and trying to pull away from [Tevault's] grasp and also trie[d] to turn toward" Tevault.  (DSOF ¶ 25; Tevault Dep. at 58:25−59:4.)  The video shows that, at the time Sgt. Boxberger arrived on the scene, Tevault was already trying to apply handcuffs to Plaintiff, which he continued to do for at least 12 more seconds, during which time Tevault twice yelled, "stop!"   (BWC at 1:42:31−44.)  At one point, Plaintiff, who was verbally agitated and continuously yelling, said more calmly, "will you stop bending my arm," and turned his head over his right shoulder.  (*Id.* at 01:42:37−44.)  This evidence, while not definitive as to whether Plaintiff was tightening his arms or trying to pull away, does not materially conflict with Tevault's account.  Plaintiff, also, does not offer any sworn testimony about what he was doing at the time to materially controvert Defendant's supported facts.

Officer Tevault also testified, and the video shows, that while Tevault was still trying to handcuff Plaintiff, Plaintiff turned to the left and jerked his left hand out to the side, away from Tevault's grasp, and raised it above his head.  (*Id.* at 01:42:40−43.)  Plaintiff claims to dispute these facts, but he relies solely on the speculative, unsupported arguments of counsel that Plaintiff pulled his left hand to the side and raised it above his head to protect himself because Tevault had first released his left hand and pushed him face-first toward the open driver's side door of the car.  (PCSOF ¶ 29)[9]  The video does

---

[9] Plaintiff's most relevant deposition testimony regarding these facts is that, once outside the car, Plaintiff closed the car door, then stood "face-to-face" with Officer Tevault, who "put his hands on me shoulders.  He kneed me in the groin.  He swung me around, so I had me back to him.  I collided with the car when he swung me around.  He - - he basically kicked me legs from under me and put me on the floor."  (Doc. 56, Ex 1 (Pl.'s Dep.) at 43:6−10.)  Plaintiff has not provided any first-hand sworn testimony about the moment he raised his left hand, purportedly because Tevault pushed him toward the open car door, and the testimony he provided at his deposition is both insufficiently detailed to account for

show Plaintiff lurching forward and momentarily hitting his left hand on the car door, and Tevault admits that he pushed Plaintiff, but according to Tevault, this happened only after Plaintiff first pulled his hand away.  (Doc. 51-2, Ex. B (Tevault Dep.) at 64:6−8, 79:23, 69:19−71:6.)  Although the Court must resolve any genuine disputes of material fact in Plaintiff's favor, absent any direct testimony from Plaintiff about these events, Plaintiff's conclusory statement that he never resisted at any time and counsel's speculation regarding why Plaintiff pulled his hand away are insufficient to create a genuine issue of material fact concerning Tevault's sworn testimony about what took place.  *See Soremekun*, 509 F.3d at 984 ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment" ); *Nilsson*, 503 F.3d at 952 n.2 ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Aside from Arpin's conclusory statement that she 'did not resist arrest in any way,' Arpin does not refute Officer Stone's report that she stiffened her arm and attempted to pull it away . . . . Arprin's conclusory allegations unsupported by factual data are insufficient to defeat the County Defendants' summary judgment motion.").

In summary, a reasonable officer in Officer Tevault's position could have reasonably believed that, in addition to committing a minor traffic offense, Plaintiff had attempted to flee from a police officer, was both passively and actively resisting handcuffing, and posed a potential flight risk.  Taken together, these factors support at least a modest government interest at stake in detaining Plaintiff.

---

many of the actions seen on video, including Officer Tevault's prolonged attempt to handcuff Plaintiff, and contradicts the video evidence in many respects, including that Plaintiff claimed to be facing Tevault when Tevault swung him around, slammed him into the car, and kicked his legs out from under him, and that the car door was closed rather than open in front of him at the time.

1    Finally, the Court must consider whether the force Officer Tevault employed when

2    attempting to handcuff Plaintiff and throwing him to the ground was proportional or

3    reasonably related to the need for force to gain control over Plaintiff at the time.

4    As an initial matter, Plaintiff has not alleged that Officer Tevault did not have the

5    authority to arrest him based on probable cause that he had committed a crime.  Moreover,

6    as discussed, a reasonable officer in Tevault's position could have believed that Plaintiff

7    had committed a minor traffic violation and had additionally fled from a police officer—a

8    more serious offense—thereby permitting him to make an arrest.  *See Bingham v. City of*

9    *Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003) *overruled on other grounds by*

10   *Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010) (Where

11   any potential crime is supported by probable cause, the arrest is justified).  Moreover, under

12   Arizona law, Plaintiff was required to comply with Tevault's attempts to arrest him, even

13   if he believed the arrest was unjustified.  *State v. Hatton*, 568 P.2d 1040, 1046 (Ariz. 1977)

14   ("one deeming himself illegally arrested can reasonably be asked to submit peaceably to

15   arrest by a police officer," relying, instead, on legal remedies to challenge his detention or

16   prosecution).

17   Because it is undisputed that Officer Tevault had probable cause to arrest Plaintiff,

18   Tevault was also permitted to use some degree of physical force to do so.  *Graham*, 490

19   U.S. at 396 (citing *Terry v. Ohio,* 392 U.S. 1, 22–27 (1968)) ("the right to make an arrest .

20   . . necessarily carries with it the right to use some degree of physical coercion or threat

21   thereof to effect it").  In this case, the modest degree of force Tevault used to attempt to

22   handcuff Plaintiff and then grab, spin, and slam Plaintiff to the ground in a controlled hold

23   after Plaintiff stiffened his arms and pulled his left hand away was proportional to the

24   modest government interests at stake at the time.  *See Washington v. Lambert*, 98 F.3d

25   1181, 1189 (9th Cir. 1996) (citing cases for the proposition that physically intrusive

26   techniques to gain compliance are objectively reasonable "where the suspect is

27   uncooperative or takes action at the scene that raises a reasonable possibility of danger or

28   flight"); *Arpin*, 261 F.3d 912, 918, 921 (twisting an arrestee's arm behind her back with

enough force to lift her off the ground was reasonable when the arrestee stiffened her arms to resist handcuffing).  The Ninth Circuit has also found in unreported cases that the use of a controlled take-down maneuver on a non-compliant traffic stop suspect was objectively reasonable.  *See Kuhlken v. City of San Diego*, 764 F. App'x 612, 614 (9th Cir. 2019) (unreported) (take down of a suspect who resisted an officer's efforts to detain her and refused to provide identification was objectively reasonable); *Bennett v. Gow*, 345 F. App'x 286, 287 (9th Cir. 2009) (unreported) (take down of a suspect who walked away from police, refused to turn over his license, and twisted away to resist handcuffing was objectively reasonable).

Plaintiff argues that Officer Tevault's use of force was unreasonable because Plaintiff had violated only a minor traffic ordinance, he did not know Tevault had attempted to approach his vehicle on foot, and he did not actively resist arrest at any time.  (Doc. 55 at 10.)  These arguments are unavailing because the Court must consider the perspective of a reasonable officer on the scene at the time, and a reasonable officer in Officer Tevault's position could have concluded that Plaintiff was attempting to flee when Plaintiff resumed driving and turned onto Sunrise while Tevault was stopped behind him and approaching his vehicle on foot.  Plaintiff's assertions that he never actively resisted Tevault at any time are also unavailing because they are based only on a single, conclusory statement of Plaintiff regarding the entire incident and the speculation of counsel as to why Plaintiff pulled his left arm away and raised it above his head during Tevault's attempts to handcuff him.  While Tevault described Plaintiff's initial conduct of stiffening his arms and turning toward Tevault during handcuffing as "passive resistance," Plaintiff has not genuinely disputed that he did these things or that he progressed to active resistance by jerking his left hand away and raising it above his head.  Although such resistance may not have been overtly dangerous or extreme, Tevault's response of taking Plaintiff to the ground through a single, controlled take-down maneuver was also not extreme, and there is no evidence Tevault employed greater force than was reasonably necessary to take control of Plaintiff.

1    Plaintiff also argues that this use of force was unreasonable because Officer Tevault
2    had less intrusive means available to him to address the situation, including that he could
3    have explained to Plaintiff the nature of the traffic stop and permitted Plaintiff to exit his
4    vehicle voluntarily before going "hands on," and he could have explained the
5    circumstances to Plaintiff before trying to place him in handcuffs.  (*Id.*)  Plaintiff also points
6    to the results of the Surprise Police Department's internal investigation, finding, in part,
7    that Tevault violated the Department's use-of-force policy, as supporting that Tevault's use
8    of force was objectively unreasonable under the circumstances.  (*Id.* at 11.)[10]

9    These arguments are also unavailing because, inferring in Plaintiff's favor that
10   other, less intrusive measures, such as explaining the reason for the stop before going
11   "hands on," would have deescalated the situation, police officers are not constitutionally
12   required to use the least amount of force available in tense, potentially volatile situations.
13   *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose
14   the least intrusive alternative would require them to exercise superhuman judgment. . . .
15   [and] would inevitably induce tentativeness by officers, and thus deter police from
16   protecting the public and themselves. . . . [when acting] under stress and subject to the
17   exigencies of the moment.").  By the same token, Tevault's failure to do more to deescalate
18   the encounter—even if this constituted a violation of internal police department policy and
19   training—does not on its own equate to a Fourth Amendment violation.  For Fourth
20   Amendment purposes, "[t]he 'reasonableness' of a particular use of force must be judged
21   from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision
22   of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the

---

24      [10] Plaintiff asserts, without evidence, that the investigation concluded that Officer
25   Tevault violated Department policy by "failing to use force that is objectively reasonable
     and necessary under the circumstances."  (Doc. 55 at 11.)  As previously noted, the only
26   evidence Plaintiff cites regarding the Surprise Police Department's internal investigation
     is Tevault's deposition testimony, stating without elaboration that officers are required to
27   attempt to deescalate a situation when possible and that the investigation made findings
     against him.  Plaintiff does not cite any evidence showing which Department policies
28   Tevault allegedly violated or the nature of the findings against him.

1    peace of a judge's chambers," violates the Fourth Amendment.  *Graham*, 490 U.S. at 396

2    (citations omitted).

3        Based on the above, Officer Tevault's use of force in attempting to handcuff

4    Plaintiff and then resorting to an abrupt but controlled take-down maneuver when Plaintiff

5    went from passively to actively resisting was reasonably related to the government interests

6    at stake at the time and did not constitute a Fourth Amendment violation.  Tevault is

7    therefore entitled to summary judgment on the ground that there was no constitutional

8    violation.

9        In the alternative, even if this use of force was objectively unreasonable in relation

10   to the need for force at the time, Officer Tevault would be entitled to qualified immunity

11   because Plaintiff fails to show that Tevault's use of force violated any clearly established

12   rights of which a reasonable officer would have known at the time.

13       Plaintiff relies on *Blankenhorn v. City of Orange*, for the proposition that "gang-

14   tackling without first attempting a less violent means of arresting a relatively calm trespass

15   suspect—especially one who had been cooperative in the past and was at the moment not

16   actively resisting arrest—was a violation of that person's Fourth Amendment rights."  485

17   F.3d 463, 481 (2006).  In *Blankenhorn*, the court found, based on the suspect's testimony

18   and video evidence, that a reasonable jury could conclude the arresting officer "never tried

19   to handcuff Blankenhorn, and Blankenhorn did not actively resist being handcuffed, before

20   [three other officers] gang-tackled him."  *Id.* at 478–79.  These facts do not squarely govern

21   the facts presented here, where it is clear from the video evidence that Plaintiff was not

22   "relatively calm," but was yelling and highly agitated, and Officer Tevault tried

23   unsuccessfully for more than 12 seconds to handcuff Plaintiff before he employed a higher

24   degree of force, including throwing Plaintiff to the ground.  Tevault's actions also did not

25   involve a gang-tackle, but a single-officer's controlled takedown.  Based on these material

26   differences, the facts in *Blankenhorn*, are too distinct from those presented here to have

27   made clear to a reasonable officer at the time of Plaintiff's arrest that Tevault's use of force

28   violated Plaintiff's Fourth Amendment rights.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153

1  (2018) ("police officers are entitled to qualified immunity unless existing precedent
2  'squarely governs' the specific facts at issue.") (internal citation omitted); *Anderson v.*
3  *Creighton*, 483 U.S. 635, 640 (1987) (for a right to be clearly established, "[t]he contours
4  of the right must be sufficiently clear that a reasonable official would understand that what
5  he is doing violates that right. . . . in the light of pre-existing law[,] the unlawfulness must
6  be apparent").

7        The other cases Plaintiff relies on also do not speak to the right at issue in this
8  instance.  *Meredith v. Erath* involved IRS agents' encounter with a non-suspect protesting
9  the agents' search of an office building, where the individual loudly demanded several
10 times to see a search warrant, and an agent "grabbed her by her arms, forcibly threw her to
11 the ground, and, twisting her arms, handcuffed her," which the court found was
12 "objectively unreasonable and a violation of the Fourth Amendment."  342 F.3d 1057, 1061
13 (9th Cir. 2003).  *Santos v. Gates* involved an officer "taking a passive individual to the
14 ground with force sufficient to break his back" when the individual failed to comply with
15 an order to put his hands on his head and, instead, dropped his hands to his sides.  287 F.3d
16 846, 854 (9th Cir. 2002).  Like *Blankenhorn*, these cases also do not speak to the
17 circumstances presented here and would not have placed it beyond dispute to all reasonable
18 officers that Officer Tevault's controlled takedown of Plaintiff while Plaintiff was yelling
19 and both passively and actively resisting being handcuffed, including by jerking his hand
20 away, violated clearly established law.

21       Because Plaintiff has not shown that Officer Tevault's use of force during Plaintiff's
22 arrest violated clearly established law of which a reasonable officer would have known,
23 Tevault is also entitled to qualified immunity on this basis.  *Romero*, 931 F.2d at 627.  The
24 Court will grant summary judgment to Tevault on Plaintiff's Fourth Amendment
25 excessive-use-of-force claim.

26 . . . .

27 . . . .

28 . . . .

**V.      Count Two: First Amendment Retaliation**

**A.      Legal Standard**

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal citations omitted).  Accordingly, "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987).  "The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state." *Id* at 463.  "Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990).

A viable First Amendment retaliation claim contains five basic elements: (1) an assertion that an official took some adverse action against an individual (2) because of (3) that individual's protected conduct, the action (4) chilled the individual's exercise of his constitutional rights, and (5) the action did not advance a legitimate state interest. *Rhodes v. Robinson*, 408 F.3d 559, 567−68 (9th Cir.2005).

As to causation, the plaintiff has the burden of demonstrating that the exercise of his First Amendment rights was a substantial or motivating factor behind the defendant's conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).  To make this showing, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing *Hartman*, 547 U.S. at 260); *see also Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir.

2013), *abrogated in part on other grounds by Nieves*, 139 S. Ct. at 1721−25 (the plaintiff must be able to prove that the officer's desire to chill his speech was a "but-for cause" of the allegedly unlawful conduct).

### B.   Discussion

Defendant does not dispute that the first, third, and fourth prongs of Plaintiff's First Amendment retaliation claim are met: (1) that Officer Tevault took adverse actions against Plaintiff, (3) that Plaintiff engaged in protected conduct when he questioned Tevault, and (4) that Tevault's action of throwing Plaintiff to the ground while Plaintiff was speaking chilled Plaintiff's protected speech.  (*See* Doc. 50 at 15−16.)  Instead, Defendant appears to argue that Plaintiff's claim fails on the second and fifth prongs: (2) that Tevault's adverse actions were "because of" Plaintiff's exercise of his First Amendment rights, and (5) that these allegedly retaliatory actions did not advance a legitimate state interest.  (*Id.*)

As to causation, Defendant claims that the video shows Officer Tevault took Plaintiff to the ground immediately after Plaintiff raised his left hand while resisting handcuffing, and there is no evidence he did so because of the content of Plaintiff's speech at the time.  (*Id.* at 16.)  Defendant argues that there is no evidence of a retaliatory motive, and there is clear evidence that Officer Tevault's use of force was due to Plaintiff's lack of physical cooperation.  (*Id.*)

Plaintiff argues that there is sufficient evidence to show that Plaintiff's protected speech was the but-for cause of Officer Tevault's increase of force against him when Plaintiff was attempting to explain himself and was questioning Tevault's implied expectation that he stop in the middle of the road.  (Doc. 55 at 14.)  He maintains that, viewing the video evidence in the light most favorable to Plaintiff, "Tevault escalated his use of force against [Plaintiff] after [Plaintiff] verbally challenged and questioned Tevault's actions."  (*Id.* at 14−15.)

Plaintiff does not dispute, however, that Officer Tevault's escalation of force from initially trying to handcuff Plaintiff to throwing Plaintiff forcefully to the ground while Plaintiff was in mid-speech also corresponded with the moment Plaintiff pulled his left

hand away and raised it above his head.  Therefore, even if Tevault was motivated, in part, by Plaintiff's verbal opposition to Tevault's actions at the time, this showing would not be enough to establish that Plaintiff's speech was the but-for cause of the sudden take-down. Plaintiff cannot prevail on his retaliation claim absent a showing that the adverse action would not have taken place "absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1722. Put another way, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  Absent this required showing, Plaintiff's retaliation claim fails as a matter of law.

Relatedly, Plaintiff's retaliation claim fails as a matter of law on the final prong— that the action did not serve a legitimate state interest. *Rhodes*, 408 F.3d at 568.  The Court has already found that Officer Tevault's sudden takedown of Plaintiff the moment Plaintiff pulled his left hand away and lifted it above his head was rationally related to a legitimate government interest in taking control of Plaintiff who was resisting handcuffing at that time.  Because Plaintiff cannot show that his speech was the but-for cause of this takedown or that Tevault's actions did not serve a legitimate state interest, Plaintiff's retaliation claim necessarily fails, and the Court will grant summary judgment to Tevault on this claim.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 50).

(2)     Defendants' Motion for Summary Judgment (Doc. 50) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 12th day of October, 2022.

James A. Teilborg
Senior United States District Judge